# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3263-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.T.,

     Defendant,

and

R.O.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
W.O. and W.O., minors.

_____

Submitted April 5, 2022 – Decided June 23, 2022

Before Judges Currier and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0087-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Cecilia M.E. Lindenfelser, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this appeal, we consider whether the court erred when it found the New Jersey Division of Child Protection and Permanency proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence and terminated defendant father's parental rights. Defendant claims there was no evidence presented at trial he actually harmed the children, the Division did not make reasonable efforts to help him find adequate housing, and the Division failed to prove terminating his parental rights would do no more harm than good to the children. The children's law guardian urges us to affirm. After reviewing the

A-3263-20

record, we conclude the trial judge's factual findings are fully supported by the record and, in light of those facts, her legal conclusions are correct. We affirm.

As set forth by Judge Nora J. Grimbergen in her well written, twenty-four-page opinion, then nine-year-old twin children -- Wyland and Wanda[1] -- were removed pursuant to N.J.S.A. 9:6-8.21 from their biological mother, Mandy, for knowingly leaving them alone in a hotel room.[2] Mandy eventually returned to the hotel and was found slumped over in her car. She tested positive for heroin. At the time, Mandy was unemployed and supporting the twins with social security benefits, food and medical benefits. The family was residing in a hotel due to homelessness. Roy, the biological father of the twins, could not be found at the time of the twins' removal and placement in the Division's custody. The Division located Roy in November of 2018.

The record reflects Roy was incarcerated for tax fraud shortly before the twins were born. He was released in October of 2013. He concedes he financially supported the children for only one year and stopped seeing them to avoid being arrested again for non-payment of child support, for which he was

---

[1] We employ pseudonyms to protect the privacy of the parties and children. R. 1:38-3(d)(12). We further adopt the pseudonyms chosen by defendant for clarity of the record.
[2] Mandy voluntarily surrendered her parental rights prior to trial on November 4, 2020, and has not joined in this appeal.

A-3263-20

arrested twelve times.  He had no contact with the children between 2016 and 2018 when he moved to North Carolina to avoid child support enforcement.

The Division has been involved with the family since 2012 due to their struggles with poverty, Mandy's mental health issues, and the children's special needs.  In 2012 the children's daycare reported Wyland and Wanda were severely delayed in communication.  The children suffer from severe asthma. They both have individualized education plans.

After a one-day trial, during which the Division called two witnesses – a caseworker and Dr. Mark Singer, an expert in psychology and parental bonding – and defendant called none, Judge Grimbergen rendered a comprehensive opinion terminating Roy's parental rights.

Our review of a trial judge's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  The trial court is best suited to assess credibility, weigh testimony and develop a feel for the case, and we extend special deference to the Family Part's expertise.  Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).

Parents have a constitutionally protected right to raise their children.  In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); see also Santosky v.

Kramer, 455 U.S. 745, 753 (1982).  Both the Federal and the New Jersey constitutions protect the inviolability of the family unit.  Stanley v. Illinois, 405 U.S. 645, 651 (1972); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986).  However, "the right of parents to be free from governmental intrusion is not absolute."  A.W., 103 N.J. at 599.  It is "tempered by the State's parens patriae responsibility to protect the welfare of the children," K.H.O., 161 N.J. at 347, "when their physical or mental health is jeopardized."  A.W., 103 N.J. at 599 (quoting Parham v. J.R., 442 U.S. 584, 603 (1979)).

When a child's parent contests the termination of parental rights, we must decide whether the parent can raise the child without causing the child further harm.  In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "[T]he cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm."  Ibid.  The "burden falls on the State to demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child."  Ibid.  The Legislature has recognized "the health and safety of the child shall be the State's paramount concern when making a decision on whether or not it is in the child's best interest to preserve the family unit." N.J.S.A. 30:4C-1(a).

"The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." K.H.O., 151 N.J. at 347. The best interest standard, codified in N.J.S.A. 30:4C-15.1(a), requires the Division establish each of the following elements by clear and convincing evidence before parental rights may be severed:

1. The child's safety, health or development has been or will continue to be endangered by the parental relationship;

2. The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

3. The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which lead to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

4. Termination of parental rights will not do more harm than good.

The four criteria are not discrete and separate, but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. The considerations involved are extremely fact-sensitive and require particularized evidence that address the

specific circumstances present in each case.  Ibid.  Emphasis has shifted from protracted efforts for reunification with a biological parent to an expeditious, permanent placement to promote the child's well-being.  N.J.S.A. 30:4C-11.1; N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).  "A child cannot be held prisoner of the rights of others, even those of his or her parent.  Children have their own rights, including the right to a permanent, safe, and stable placement."  Ibid.

The key question with respect to the first prong of N.J.S.A. 30:4C-15.1(a), is not whether the parents "are themselves unfit or whether they are the victims of social circumstances beyond their control."  A.W., 103 N.J. at 607.  Rather, the question is "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care."  Ibid.  "No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health."  Ibid.  Even when the parents are not blameworthy because they were "short-changed by either nature or society," this prong is satisfied when their behavior "indicates a further likelihood of harm to the child in the future."  Id. at 615-16.

A court need not find actual harm occurred.  This prong refers to the harm that "threatens the child's health and will likely have continuing deleterious

effects on the child." K.H.O., 161 N.J. at 353. Although a single harm can trigger the best interest standard, "the standard may be triggered by an accumulation of harms over time." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004). The trial court found Roy harmed his children because a parent's failure to provide love and nurture to a child is a recognizable harm in New Jersey, despite the Division's lack of findings of abuse and neglect against him.

Roy engaged in supervised visitation with the children while they were in resource care, despite not having had any relationship with them for the two years prior to their removal. He also engaged in individual therapy and attended several psychological evaluations. However, Roy demonstrates a marked lack of insight regarding his role in the children's lifelong instability and lack of responsibility for their needs. Prior to their removal, he refused to provide for them financially, voluntarily absenting himself from their lives to avoid paying child support. During the entire time they were in resource care, he failed to provide a plan for their housing and blames "the system" for his lack of preparedness. He failed to identify any source of income. A parent's failure to provide a "permanent, safe, and stable home" engenders significant harm to a child. D.M.H., 161 at 383.

The Supreme Court has stated the first and second prongs "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. The inquiry in the second prong is "aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child and is able to continue a parental relationship without recurrent harm to the child." Ibid.

Title Thirty presents some difficulties when applied to matters where the parent at issue has never been the primary caregiver of the child, because it speaks to "remediation" of the prior existing harm and "reunification" of the child with the parent. It is undisputed the children were not removed from Roy, but from Mandy, who exposed them to risk of harm. In the instant case, Roy never lived with or parented Wyland or Wanda. Nevertheless, the court found Roy's failure to provide a safe and stable home for the children rendered him unfit as a parent and delayed their stability.

Throughout the children's lives, both prior to their removal and after they were placed in resource care, Roy acted minimally and without any sense of urgency to their needs. He knew the children were suffering from homelessness and was aware of the Division's involvement in their lives years before their eventual removal yet made no effort to obtain custody or financially provide for

9

them. He left the State to avoid child support enforcement. During the entire time the children were in resource care, Roy resided in a one-bedroom apartment; his adult son slept in the bedroom while he and his wife slept in the living room. It remained dangerously full of storage and clutter.

Once the children were removed, Roy was made aware of the statutory timeline for the children's permanency by both the Division and the court and, in fact, the twelve-month goal of reunification was extended an additional three months to see if reunification with him could be achieved. He claimed he could not provide appropriate housing for the children due to his prior incarceration and his existing credit score. Roy is financially supported by his adult children and states he is "retired;" at trial he failed to demonstrate any inability to earn income. Roy never presented a stable parenting plan for the children, and never identified adequate housing or a source of income for their care. "Concern and efforts by a natural parent after his or her child has been removed from the home and making genuine and successful efforts…is of enormous significance" when determining fitness. N.J. Div. of Youth & Fam.-Servs. v. A.R., 405 N.J. Super. 418, 437 (App. Div. 2009).

N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make reasonable efforts to provide services that will enable a parent "to become a functioning

parent and caretaker of [his] child . . . ." K.H.O., 151 N.J. at 354. It "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into [resource] care." Ibid. Those efforts "must by their very nature take into consideration the abilities and mental conditions of the parents." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001). Nonetheless, the Division does not have to attempt more than "reasonable efforts under the circumstances to accommodate [a parent]'s disabilities," and a court may not find the efforts unreasonable simply because they "did not bear fruit." Ibid.

The trial court found substantial evidence the Division provided Roy with reasonable services throughout the litigation. The Division offered supervised visitation once a week, which Roy attended regularly and all parties concede went well until the summer of 2020, when Roy's interrogation of the children and comments to the children about the pending litigation made them cry and act out behaviorally. Roy underwent various psychological evaluations. He was offered and attended parenting skills class and individual therapy. He participated in family team meetings with the Division and the litigation. He also met with the resource parents. Roy offered his wife as an integral part of

his parenting plan but also claimed she is an invalid who needs his constant care. The Division made several efforts to evaluate her as part of Roy's parenting plan, even offering an in-home evaluation, which both he and his wife refused.

Specifically with respect to housing, Roy requested the Division rent an apartment in the agency's name because he claimed he was unable to obtain housing assistance due to his prior incarceration. The Division informed him it could not rent housing under an assumed name, but provided him a list of low-income housing, a recommendation letter to the Safe House program, referred him to the Housing and Urban Development and Keeping Families Together programs, and a referral to Legal Services to assist with his particular housing concerns. At trial, Roy did not submit any evidence he contacted these agencies and his credit score was not admitted in evidence. He also submitted no evidence his prior incarceration was an impediment to obtaining housing. [3]

N.J.S.A. 30:4C-15.1(a)(4) assesses whether termination of parental rights will do more harm than good to the children. It "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). Pursuant to the fourth

---

[3] Tax fraud is not listed as a mandatory or discretionary basis for the denial of HUD benefits pursuant to 24 C.F.R. §§ 982.552 - 553.

prong the trial court must determine "whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with its natural parents than from the permanent disruption of [their] relationship with [their] foster parents." K.H.O., 161 N.J. at 355. The Division also "must show 'that separating the child from his foster parents would cause serious and enduring emotional or psychological harm.'" Ibid. (quoting J.C., 129 N.J. at 19).

However, it has long been recognized where a parent is unable to care for a child for a prolonged period of time . . . and would not be able to take custody for an indefinite period of time, it is against a child's best interest to prolong resolution of his status by indefinitely extending foster care placement. N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996).

Although the Division's expert found no underlying pathology rendering Roy unable to parent, he failed to demonstrate the necessary urgency to parent them both before and while his children were in resource care. Roy has never taken the steps necessary to parent his children during their lifetimes. He has been unwilling to accept any responsibility for their instability. Harm is caused

13

by withdrawing "the most precious of all resources, a parent's attention and care." A.W., 103 N.J. at 613.

One Division expert opined Roy does not take responsibility for his actions and displays narcissistic features, which explain his inability to accept any personal shortcomings. Dr. Singer testified at trial that although Roy exhibits no psychosis or formal thought disorder that would prevent him from parenting, he presents with a degree of paranoia and persecution. He also minimalizes personal faults and expects strict obedience to his demands, rendering him inflexible in parenting. Dr. Singer's uncontroverted, expert opinions – that the children have a heightened need for stability and consistency and Roy cannot empathize with them or understand these special needs – formed the basis for the trial court's finding the Division had proved prong four. Dr. Singer further opined the children do not view Roy as a significant parental figure and he is not likely to become a viable parent in the near future despite his expressed willingness. In contrast, Dr. Singer opined the children's resource parents are their psychological parents and a "source of stability." He opined if the relationship with the resource parents was severed it "would have a marked impact" upon them that Roy could not mitigate.

14

We find no fault in the judge's reliance upon the unrebutted expert testimony, or her consideration of other evidence adduced at trial, and conclude her findings are supported by credible evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3263-20