**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1596-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

C.L.,

    Defendant-Appellant,

and

B.W., J.O., and C.C.,

    Defendants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF M.K.W., M.J.C., and S.C.O.,
MINORS.

_____

        Submitted October 2, 2017 — Decided November 3, 2017

        Before Judges Ostrer and Rose.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Essex County,
        Docket No. FG-07-0185-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Eric J. Meehan, Designated
        Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Joshua Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (James J. Gross, Designated Counsel, on the brief).

PER CURIAM

Defendant, C.L.,[1] appeals from the Family Part's November 30, 2016 judgment of guardianship[2] terminating her parental rights to three of her four biological children, M.K.W., born in November 2009, M.J.C., born in March 2011, and S.C.O., born in August 2012.[3] Defendant contends plaintiff New Jersey Division of Child Protection and Permanency ("Division") failed to prove the four

---

[1] We use initials to protect the privacy of the parties. See R. 1:38-12(d)(12).

[2] Judgment of guardianship by default was also entered against defendant B.W., the biological father of M.K.W., and defendant J.O., the biological father of S.C.O., neither of whom appeal. The record indicates defendant C.C. defaulted and did not oppose the termination of his parental rights because his biological child, M.J.C., has been placed in the custody of C.C.'s mother. Although the order reflects C.C. "does not wish to appeal the termination of his parental rights," the order does not specify that C.C.'s rights were terminated.

[3] Defendant is also the biological mother of G.K., Jr., born in March 2014. G.K., Sr. is the biological father of G.K., Jr. Although originally named as parties in this action, G.K., Sr. and G.K., Jr. were subsequently dismissed from the guardianship complaint, and G.K., Jr. was placed in the custody of G.K., Sr.

prongs set forth in <u>N.J.S.A.</u> 30:4C-15.1(a) by clear and convincing evidence. The law guardian supported termination before the trial court and, on appeal, joins the Division in urging us to affirm. Having considered defendant's arguments in light of the record and controlling law, we affirm the judgment of guardianship and remand to correct the order.

## I.

We discern the following facts and procedural history from the record on appeal. Defendant's history of involvement with child protection agencies began in 2010 with New York City Administration for Children's Services ("ACS"). The Division became involved with defendant in early December 2014, following a referral from ACS concerning defendant's mental health, non-compliance with prescribed medication and court-ordered treatment services, alcohol and substance abuse, inadequate guardianship and domestic violence. ACS believed defendant was living in New Jersey, and a warrant related to a domestic violence incident was pending against her.

On December 20, 2014, the Division received a referral from the Newark Police Department that defendant had witnessed M.K.W. and M.J.C. engaging in oral sex at G.K., Sr.'s home. The same day, the Division interviewed defendant and M.K.W.

Defendant confirmed she had witnessed the sexual incident between her sons, but did not immediately notify the police because she thought G.K., Sr. would "handle it."  Defendant acknowledged she and G.K., Sr. had ongoing domestic violence issues, but they continued to reside together because she did not have anywhere else to live.  Defendant stated further she had been diagnosed with bipolar disorder, but was not taking any medication or pursuing any medical treatment.  Defendant declined the Division's request for a urine screening, but admitted she had used marijuana in the past.

M.K.W. confirmed M.J.C. had performed oral sex on him, but that G.K., Sr.'s oldest son, J.K., had orchestrated the act. M.K.W. also stated that J.K. had forced M.K.W. to perform oral sex on J.K.  Based on the ongoing domestic violence concerns, defendant's untreated medical condition, and the potential for harm from J.K., the Division executed an emergency "Dodd" removal[4] of defendant's four children pursuant to N.J.S.A. 9:6-8.28 on December 20, 2014.

On December 23, 2014, the court awarded custody, care, and supervision of all four children to the Division and appointed a

_____

[4] A Dodd removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82 known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

law guardian. The court ordered the Division to refer defendant for psychiatric and psychological evaluations, and a Certified Alcohol Drug Counselor ("CADC") assessment. The court also ordered the Division to refer defendant and G.K., Sr. to a domestic violence liaison. Defendant was granted two hours of weekly supervised visitation. On the same date, defendant tested positive for marijuana.

Over the next year, the Division provided defendant with court-ordered services, without success. Defendant's lack of compliance is marked by her repeated refusal to attend psychiatric evaluations, failure to complete a CADC assessment, and non-compliance with parenting classes. Throughout the year, defendant resided primarily in homeless shelters.

During the fact-finding hearing on April 16, 2015, defendant executed a Voluntary Stipulation/Admission to Child Abuse or Neglect pursuant to N.J.S.A. 9:6-8.21(c). Among other things, defendant admitted her long history with ACS in New York due to inadequate supervision of her children, housing instability, substance abuse, and mental health issues. She admitted further she failed to immediately contact the authorities when she witnessed the inappropriate sexual behavior between her sons. Defendant acknowledged these circumstances constituted inadequate supervision and placed her children at risk of harm.

Following a permanency hearing on December 17, 2015, the court approved the Division's plan of termination of defendant's parental rights to M.K.W., M.J.C. and S.C.O.[5] On January 28, 2016, the Division filed a complaint for guardianship for the three children. The Division continued to refer defendant for services, but she remained non-compliant.

Trial was held on November 30, 2016. The Division presented testimony from a caseworker, and Dr. Peter DeNigris, an expert in psychology. Dr. Andrew Brown, also qualified as an expert in psychology, testified on behalf of defendant.

At the conclusion of trial, the judge placed his oral decision on the record, finding the Division presented clear and convincing evidence of the four prongs of the N.J.S.A. 30:4C-15.1(a) "best interests of the child" test necessary to terminate defendant's rights to M.K.W., M.J.C. and S.C.O. The court approved "a permanency plan of termination of parental rights followed by

---

[5] Although G.K., Jr. and G.K., Sr. were removed from the litigation, the court determined, at the permanency hearing, it was not safe to return G.K., Jr. to defendant due to her unstable housing and unrectified substance abuse and mental health illness during the past year that G.K., Jr. has been in placement.

adoption with the foster homes as to the older children and the younger to a select home."[6]

On appeal, defendant argues the judgment of guardianship should be reversed because the Division failed to prove all four prongs of the best interests standard by clear and convincing evidence, and the trial judge's findings were not sufficiently thorough to meet the required standard under Rule 1:7-4. We disagree.

## II.

The scope of our review on an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We "accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters

---

[6] Following C.C.'s recommendation, on October 30, 2016, the Division had placed M.J.C. with his paternal grandmother who planned to adopt him.

related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2014) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., supra, 196 N.J. at 104 (quoting G.L., supra, 191 N.J. at 605)).

When terminating parental rights, the court focuses on the "best interests of the child standard," and may grant a petition when the following four prongs are established by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., supra, 161 N.J. at 348.

The trial judge conducted a fact-sensitive analysis of the four prongs. The testimony of the witnesses and the record before the court support its findings.

The trial judge's findings concerning the first and second prongs overlapped. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999); see also N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006), certif. denied, 190 N.J. 257 (2007).

As to prong one, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., supra, 161 N.J. at

352)). Generally, the proofs "'focus on past abuse and neglect and on the likelihood of it continuing.'" N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 609 (App. Div.) (quoting In re Guardianship of J.C., 129 N.J. 1, 10 (1992)), certif. denied, 192 N.J. 68 (2007). Moreover, in guardianship and adoption cases, the child's need for permanency and stability is central. K.H.O., supra, 161 at 357.

It is well settled that the Division need not demonstrate actual harm to satisfy prong one. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002). The focus under the first prong is not on any "single or isolated harm," but rather on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., supra, 161 N.J. at 348 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-10 (1986)). The harm may be established by "a delay in establishing a stable and permanent home." D.M.H., supra, 161 N.J. at 383.

The second prong of the best interests standard relates to parental unfitness. K.H.O., supra, 161 N.J. at 352. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease to inflict harm upon the child. A.W., supra, 103 N.J. at 607. "The second prong,

10

in many ways, addresses considerations touched on in prong one." F.M., supra, 211 N.J. at 451.

The record supports the trial judge's ruling that the Division established the first and second prongs by clear and convincing evidence. At the outset of his decision, the trial judge found the experts agreed defendant was incapable of parenting at the present time and in the foreseeable future.

Specifically, Dr. DeNigris' testimony at trial reiterated the conclusion he reached when he assessed defendant six months earlier, that is, she is not fit to parent. He testified defendant's untreated mental health issues, combined with her possible substance abuse, create a safety risk for the children. Moreover, defendant's noncompliance with treatment suggests her mental health issues remain untreated and undermine her goal of reunification. Defendant's expert, Dr. Brown, agreed, "[s]he cannot parent, certainly in her current state of mind, and she could not parent when I saw her."

The trial court expounded further:

> It's clear that she's had a long history with the Division, a long history with ACS four years before that . . . . She has raised substantial issues regarding her mental health, her compliance with mental health treatment, her housing and instability, her drug use. All of these issues were there initially, were there before the Division got involved, and continue exactly the same today.

. . . .

> [S]he's had a very long history as a child under Division custody, of . . . being raised by relatives, losing it, being in foster care, running away, sexually abused, physically abused. She describes a mental history . . . going back to age six and being medicated back then.
>
> And -- unfortunately, no one has broken through that barrier and I don't know how that's going to happen without [defendant's] cooperation.

Both experts diagnosed defendant as bipolar and having post-traumatic stress disorder. In fact, Dr. Brown observed a manic-depressive episode by defendant outside the courtroom on the day of trial.

The trial court was unpersuaded, however, by Dr. Brown's testimony suggesting defendant's lack of compliance with medication and services was a result of the Division's failure to afford defendant cognitive behavioral therapy which focuses on the patient's level of awareness through education and repeated exposure. As the trial court observed, however,

> . . . you can offer anything, a Ph.D., you can offer an M.D., you can offer any type of service available. But you're never going to get any benefit unless she actually goes and participates.

We are satisfied, therefore, the record supports the trial court's determination that the Division satisfied prongs one and

12

two by clear and convincing evidence.  Defendant was not only offered mental health treatment services by the Division, but also by ACS, four years before defendant became known to the Division. Clearly, defendant's inability to treat her mental health issues and provide a stable home placed the children in an unsafe environment, commencing with their exposure to inappropriate sexual behavior and domestic violence when residing with defendant.  In the nearly two years since their removal, defendant did not avail herself of services to treat her mental illness.  As the trial court observed:

> We don't have any way of making someone comply with services if they are not motivated to do so.
>
> Now, the mental health may be causing lack of motivation, that may be the cause.  But we don't have any way of treating it without their cooperation and agreement to be treated. And agreement to services.  We can't make them do things they don't want to do.

Therefore, there is substantial credible evidence supporting the judge's findings that defendant is unwilling or unable to eliminate the harm facing the children, or is unable or unwilling to provide a safe home for the children.

The third prong requires the Division to make diligent efforts to reunite the family.  K.H.O., supra, 161 N.J. at 354.  Reasonable efforts will vary with the circumstances.  F.H., supra, 389 N.J.

Super. at 620. Whether a parent successfully completed the services offered is not relevant to whether the third prong has been met because the Division's efforts are not measured by their success. D.M.H., supra, 161 N.J. at 393. "These efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case." Ibid.

Defendant contends the record does not support the court's legal conclusion that the Division satisfied its statutory obligation to provide defendant with reasonable services to effectuate reunification. She contends the Division failed to make referrals for five months. Through the testimony of Dr. Brown, she also claims the Division failed to tailor her mental health treatment to her needs. The record, however, belies her contentions.

The record reflects the Division offered defendant a host of services, over the course of a year, prior to filing the guardianship complaint, and thereafter. Referencing reports in evidence, the caseworker testified the Division afforded defendant psychological and bonding evaluations, multiple CADC assessments, individual behavioral therapy, parenting classes, and assistance in obtaining suitable housing and employment, but she failed to follow through with the services, or provide proof of employment.

Contrary to defendant's contention, the caseworker stated the Division referred defendant for a psychological evaluation and individual therapy sessions during the five-month period at issue. Moreover, defendant advised the Division she was receiving psychiatric treatment, medication and recommendations for therapy from Project Renewal during this timeframe.

We are satisfied, therefore, there is compelling evidence in the record that defendant simply failed to avail herself of the services offered by the Division. Thus, the judge's findings that the Division made reasonable efforts to provide services to defendant was amply supported.

Furthermore, the record supports the court's recognition that alternatives to termination of parental rights pursuant to N.J.S.A. 30:4C-15.1(a)(3) were unavailable in this matter. Defendant failed to propose any relatives for placement for the children. C.C. provided his mother as a placement source, and probable adoptive mother for M.J.C. Having defaulted, neither B.W. nor J.O. participated in the matter on behalf of their respective children. Because there were no alternatives to termination of defendant's parental rights, we are satisfied, there is ample support in the record to support the court's determination that "permanency . . . can only be done through termination of parental rights."

As to the fourth prong, while termination of parental rights poses a risk to children, due to the severing of the relationship with their natural parents, it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., supra, 161 N.J. at 355 (quoting J.C., supra, 129 N.J. at 26)). Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." Id. at 355.

When the case involves a foster placement, "the court must inquire into the child's relationship both with her biological parents and her foster parents." Ibid. However, when a termination action is not based on bonding between foster parents and the child, the inquiry is focused on the child's need for permanency and the parent's inability to care for the child in the foreseeable future. N.J. Div. of Youth and Family Servs v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). Termination of parental rights is appropriate "where a child has been in placement for more than one year, and the family has failed to remedy the problems that cause placement, despite [the Division's] diligent efforts." K.H.O., supra, 161 N.J. at 358.

Although there are "very few scenarios" in which comparative bonding evaluations are not required, N.J. Div. of Youth & Family

Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009), this case presents such a scenario. The argument that the fourth prong is satisfied here is not that the children would be harmed by losing their relationship with their respective foster parents, which plainly would require comparative evaluations. See J.C., supra, 129 N.J. at 18. Rather, the harm posed is defendant's unfitness as a parent, irrespective of any attachment any of the children has to his or her foster family.

We recognize that great harm can result if termination is ordered "without any compensating benefit, such as adoption," and that "[s]uch harm may occur when a child is cycled through multiple foster homes" following termination. E.P., supra, 196 N.J. at 109. However, a child's need for permanency and stability is a "central factor" in these cases. K.H.O., supra, 161 N.J. at 357-58. Indeed, our courts have long recognized that termination may be warranted where no immediate prospect for adoption exists and, consequently, where no comparative evaluations with prospective adoptive parents could even be available. A.W., supra, 103 N.J. at 611. This can occur in circumstances where the search for an appropriate home cannot be undertaken until after termination.

Notwithstanding defendant's argument that the children were bonded to her, and that the Division had not found an adoptive home for S.C.O., giving due deference to the judge's findings,

F.M., supra, 211 N.J. at 448-49, we are satisfied the judge did not err in finding the Division provided clear and convincing evidence as to the fourth prong.

Specifically, the court acknowledged both experts agreed there would be some harm if defendant's parental rights were terminated. However, the court found there was no possibility in the near future the children would achieve permanency without termination. The court concluded termination would not do more harm than good because of the importance of permanency.

The evidence in the record supports the court's findings. Initially, Dr. DeNigris testified that, while a healthy bond exists between defendant and her children, her untreated mental health issues would cause more harm to the children if they were reunited. He reasoned that the children have been removed from defendant's care for nearly two years, yet despite numerous chances, she has failed to address the issues. He opined that termination of defendant's parental rights followed by adoption was in the best interests of the children. He concluded that, based on defendant's failure to comply, delaying termination would be unreasonable.

Secondly, the caseworker testified as to the children's needs. M.K.W. has medical and emotional issues requiring extensive medical attention and ongoing therapy. M.J.C. also requires therapy and services from the school he attends. S.C.O. has

18

behavioral issues that require attendance at a therapeutic nursery school. The caseworker confirmed that the children would be at risk of abuse and neglect if they were reunited with defendant.

Considering defendant's long history of non-compliance and inability to address her mental health issues, the trial court properly adopted both experts' opinions that defendant was incapable of parenting, and found the only chance the children have for permanency is termination of defendant's parental rights. Had defendant exhibited progress in addressing the issues that prevented her from offering her children a stable environment, she may have offered a better alternative than the homes in which the children then resided.

Moreover, the court found defendant incapable of meeting the special needs of all three children. Although M.K.W. and M.J.C. were not adopted at the time of trial, they remained in foster care placements with the hope of adoption,[7] while the plan for S.C.O. was select home adoption.

---

[7] In her June 26, 2017 reply brief, defendant argues, without providing a certification or other documentation, that the Division's placements of M.K.W. and M.J.C. failed in May 2017. These post-trial changes in placement are not properly before us, and do not alter our conclusion as our prong four analysis in this case was not premised on the children's bonding with their respective resource parents, but rather on defendant's ongoing parental unfitness.

A-1596-16T1

Because defendant had not addressed the issues that led to the children's removal, the judge properly considered the children's need for permanency and stability, finding "there is no possibility in the foreseeable future that they will ever get permanency unless we terminate parental rights."

We are satisfied the Division proved all four prongs and termination of defendant's parental rights to M.K.W., M.J.C. and S.C.O. was properly ordered.

Affirmed in part; remanded in part for correction of the judgment of guardianship, within thirty days, to reflect C.C.'s parental rights to M.J.C. were terminated.[8] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] See supra, footnote 2.

A-1596-16T1