# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4668-18T4

NEW JERSEY DIVISON
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.R.,

      Defendant-Appellant,

and

W.A.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.R.,

      a Minor.

_____

      Submitted June 1, 2020 – Decided July 13, 2020

      Before Judges Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0044-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Phuong Vinh Dao, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Peter Damian Alvino, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant, J.R. (John),[1] appeals from the Family Part's June 10, 2019, order terminating parental rights to his biological daughter, Cara, then three and one-half years old. Judge Jane Gallina Mecca convened a guardianship trial after which she ruled that the Division of Child Protection and Permanency (Division) proved the four prongs of the best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence. On appeal, defendant

---

[1] For the reader's convenience, we use pseudonyms for defendant, codefendant W.A. (Willa), their daughter, Cara, and the child's maternal grandmother, Wanda.

challenges the trial court's findings with respect to all four prongs. The Division and Cara's Law Guardian contend the evidence at trial was sufficient and urge us to affirm the judgment.

The record before us clearly shows that John has chosen to be a complete stranger to his daughter. The Division presented overwhelming and uncontradicted evidence that defendant did not cooperate with services offered by the Division, did not appear for evaluations or drug screenings, did not attend court proceedings, including the guardianship trial, and did not visit Cara or seek to visit with her. Cara is currently placed with her maternal grandmother, Wanda, who is willing and ready to adopt her.

After carefully reviewing the record in view of the parties' arguments, applicable legal principles, and standard of review, we affirm the termination of John's parental rights substantially for the reasons set forth in Judge Mecca's oral opinion. The judgment will free Cara for adoption by her grandmother, who will continue to provide her permanency, stability, and love.

I.

We briefly summarize relevant events in the long procedural history leading up to this appeal. On October 24, 2016, Cara was placed into the care and supervision of the Division because of allegations that her mother, Willa,

was under the influence of illicit substances and unable to care for the child. John did not appear at the hearing. The judge found that the Division made a prima facie showing that Cara was abused or neglected. The court ordered John and Willa to attend a substance abuse evaluation and submit to random urine screens, hair follicle, and nail tests. Additionally, the court ordered that any contact between Cara and her parents must be supervised by the Division or a Division-approved person.

On March 1, 2018, Cara was placed in the home of her maternal grandmother, Wanda. On October 2, 2018, a Family Part Judge entered a permanency order finding the Division's permanency plan of termination of parental rights was appropriate and acceptable because both Willa and John had untreated substance abuse issues and were noncompliant with services. On November 13, 2018, the Division filed a complaint for guardianship.

On June 10, 2019, Willa appeared before the court telephonically and surrendered her parental rights to Cara so that Wanda could adopt her. Judge Mecca then held a guardianship trial concerning John's parental rights. John did not appear at the trial and no evidence was presented on his behalf. Judge Mecca issued an oral decision terminating John's parental rights after finding that the Division met its burden of proof under the best-interests-of-the-child test.

4

II.

We presume the parties are familiar with the facts relevant to this litigation. We focus on the evidence adduced at the guardianship hearing concerning John's persistent efforts to evade the Division, revealing his indifference towards Cara. We need not, however, recount every instance when defendant failed to reply to notices, meet with Division caseworkers, answer his phone or return voicemail or text messages, submit to drug tests, submit to an evaluation by a psychologist, attend court hearings, or attend scheduled visits with Cara.

The gist of defendant's argument is that the Division did not prove that his mother actually gave him the mail the Division sent to him while he lived at her house. That argument is implausible. But even were we to accept his bald assertion that his mother suppressed written correspondence sent to him, and failed to tell him when Division employees came to the house to speak with him in person, the occasional contacts between defendant and the Division amply support the trial court's findings with respect to his indifference to reuniting with Cara.

On one occasion, John walked away from a Division employee who came to the house. On two other occasions when Division employees visited John's

mother's house unannounced, he was home but refused to leave his bedroom to talk to the employees. On another occasion, a Division employee went to John's home but was informed by John's mother that he did not want to speak with the employee. On yet another occasion, a Division employee went to the home accompanied by Wanda. John briefly spoke with Wanda but refused to speak to the employee.

Even when John at one point expressed some interest in receiving services from the Division, he failed to follow through. Instead, he returned to his pattern of refusing to communicate with the Division, hanging up and turning off his phone, failing to answer voicemail messages, refusing to submit to psychological and substance abuse evaluations, failing to attend court hearings, and failing to attend scheduled visits with Cara.

At the guardianship trial, the court heard testimony from a psychologist and from a Division caseworker. No witnesses testified on behalf of John.

The Division's expert, Dr. Dyer, testified that because he was unable to meet with John to conduct an evaluation, he had no opinion as to John's parenting capacity or psychological functioning. Dr. Dyer did opine, however, that Wanda is a competent and well-adjusted adult who is emotionally invested in Cara. He also testified that Cara referred to Wanda as "mommy," indicating

6

that after two years of placement together they had developed a profound attachment to each other.

Dr. Dyer further opined that removing Cara from Wanda's care would be distressing, lead to behavior regression—including aggressive and withdrawing behavior—and would place Cara at risk for long-term effects on her self-esteem, trust, and capacity for attaching to new caretakers. Dr. Dyer testified that delaying permanency for Cara would cause tremendous harm, in part because of her strong attachment to Wanda and John's absence in her life.

A Division caseworker testified as to John's unresponsiveness and outright evasions, laying out the numerous instances when John refused to engage with the Division, or with Cara. On cross-examination, she acknowledged that the Division had no personal knowledge if the letters the Division sent to John's mother's home were actually given to John.[2]

The trial court made several findings of fact, including that John had chosen not to take advantage of any Division services. The court also found that he chose not to take advantage of any visitation opportunities. The court

---

[2] That cross examination appears to be the gravamen of John's trial strategy. We note that John did not testify or present any evidence to support his claim that his mother did not relay Division correspondence and in-person or telephonic messages to him.

A-4668-18T4

concluded that John had "no true interest" in reunifying with Cara. The court agreed with Dr. Dyer that Cara's safety and emotional well-being depended on her remaining in Wanda's care.

## III.

We begin our analysis by acknowledging the legal principles governing this appeal. A parent has a constitutional right to raise his or her biological child, which "is among the most fundamental of all rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102 (2008)). However, the State as parens patriae may act to protect a child from physical or emotional harm. Ibid. (citing E.P., 196 N.J. at 102). A parent's constitutional rights, in other words, are not absolute and must yield to the State's interest in protecting a child from harm or endangerment. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986) (citing In re Dep't of Pub. Welfare, 412 N.E.2d 28, 36 (Mass. 1981)). Accordingly, the State can seek to sever the parent-child relationship when the interests of the parent and child are irreconcilable. Ibid. (citing Dep't of Pub. Welfare, 412 N.E.2d at 36). Importantly, a child has a right to a permanent, stable, and safe placement. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The termination of parental rights should only be pursued when "proof of parental unfitness is clear." <u>F.M.</u>, 211 N.J. at 447. In a termination proceeding, the trial court determines whether the Division has satisfied the four elements of the best-interests-of-the-child statutory test. N.J.S.A. 30:4C-15.1(a). That statute requires the Division prove by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [<u>Ibid.</u>]

When applying the best interests test, a trial court must pay specific attention to a child's need for permanency and stability. <u>In re Guardianship of</u>

<span>A-4668-18T4</span>

D.M.H., 161 N.J. 365, 385–86 (1999).  As a result, the trial court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

The scope of appellate review of the decision to terminate parental rights is limited.  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record."  Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).  An appellate court should defer to the trial court's credibility determinations and to its "special expertise in the field of domestic relations."  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). An appellate court therefore should not alter the findings below unless there was a manifest denial of justice.  N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J. Super. 243, 255 (App. Div. 1989) (citing Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475 (1988)).  However, appellate courts review de novo the

trial court's interpretation of the law and legal findings. <u>R.G.</u>, 217 N.J. at 552 (citing <u>Manalapan Realty v. Manalapan Twp. Comm.</u>, 140 N.J. 366, 378 (1995)).

IV.

John contends that the trial court erred in finding that the Division satisfied prong one of the statutory test because the Division never substantiated or established that he abused or neglected the child. That argument misconstrues the law. John's failure to nurture or care for Cara for a prolonged period of time amply satisfies this prong.

Under the first prong of the best-interests-of-the-child test, the trial court examines the effect of the harm that stems from the parent-child relationship over time. <u>N.J. Div. of Youth & Family Servs. v. P.P.</u>, 180 N.J. 494, 506 (2004). It may consider both physical and psychological harm and, therefore, may base its termination decision on emotional injury in the absence of physical harm. <u>See</u> <u>In re Guardianship of R.</u>, 155 N.J. Super. 186, 194 (App. Div. 1977) ("The absence of physical abuse or neglect is not conclusive on the issue of custody."). Further, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." <u>D.M.H.</u>, 161 N.J. at 379 (citing <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 352–54 (1999)).

Furthermore, a parent's "persistent failure to perform any parenting functions and to provide nurture, care, and support" to a child is "a parental harm to that child arising out of the parental relationship" under the statute.  Id. at 380 (citing K.H.O., 161 N.J. at 352–54).  Stated differently, "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights."  In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (emphasis added) (citing J.C., 129 N.J. at 18).

In this instance, Judge Mecca found that John "has shown no active role in attempting to visit with the child."  We conclude the trial record provides ample support for Judge Mecca's conclusion that John's inaction has caused harm sufficient to satisfy the first prong of the four-part test.

## V.

We next address John's contention that the trial court erred in finding the second prong of the best-interests-of-the-child test.  That prong requires the Division to demonstrate that the "parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm."  N.J.S.A. 30:4C-15.1(a)(2).  This prong, which is closely related to the first

12

prong, can be demonstrated in two alternative ways. K.H.O., 161 N.J. at 352. First, the Division can show that it is reasonably foreseeable that the parent will not or cannot cease to inflict harm upon the child. A.W., 103 N.J. at 606–07, 615–16. This can be established by proving parental "dereliction and irresponsibility," which can be shown by proof of continued substance abuse, the inability to provide a stable home, and the withholding of nurturing and attention. K.H.O., 161 N.J. at 353.

The other way of establishing the second prong is by presenting evidence that removing the child from his or her resource placement would cause serious and enduring mental or emotional impairment. N.J.S.A. 30:4C-15.1(a)(2). Under this alternative approach, a trial court examines the bonds between a child and his or her resource parent(s). See D.M.H., 161 N.J. at 382 (finding the second prong from N.J.S.A. 30:4C-15.1(a) established partly based upon the court-appointed expert's determination that "breaking the children's bond with their foster family would cause substantial and enduring harm to the children").

We believe the proofs submitted at the guardianship trial amply establish the second prong under both theories. Defendant's dereliction and irresponsibility in the form of withholding of nurturing and attention is self-evident. The trial court in its opinion, however, focused on the second option.

Judge Mecca concluded, "[i]n this case, Dr. Dyer testified that the child, [Cara], was doing quite well with the current resource parent, her grandmother, and the removing the child from that relationship would have both short-term and long-term effects that would be devastating to [Cara] and would cause serious harm to her."

We hold the trial court acted well within its discretion in crediting Dr. Dyer's unrefuted testimony. The expert's opinion constitutes substantial credible evidence to clearly and convincingly satisfy the second prong.

VI.

We turn next to the third prong of the statutory test, which requires the Division to show that it made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to the termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). As a result, the trial court must decide if the Division made reasonable efforts to reunify the family. K.H.O., 161 N.J. at 354 (citing N.J.S.A. 30:4C-15.1(a)(3)). Pursuant to statute, "reasonable efforts" are defined as:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;

A-4668-18T4

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

We have previously recognized that reasonable efforts "vary depending upon the circumstances of the removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007) (citing N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 437 (App. Div. 2007)). The Division's success regarding this prong is not measured by the parent's participation in the necessary services. D.M.H., 161 N.J. at 393. "[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. Pursuant to statute, the Division must: (1) work with parents to develop a plan for services; (2) provide the necessary services; (3) facilitate visitation; and (4) notify parents of the children's progress during an out-of-home placement. N.J.S.A. 30:4C-15.1(c).

John contends the Division did not prove the third prong by clear and convincing evidence because several notices were delivered to his mother's address and the Division has no proof John actually received those notices. We

15

have already noted this contention is utterly devoid of merit. John provided his mother's address for the Division to communicate with him. On multiple occasions John's mother told a Division employee she would pass along a mailing or message. Furthermore, although John's modus operandi was to avoid personal contact with Division employees, there were instances when a Division employee was able to speak with John and hand deliver to him notices of upcoming court dates and evaluations.

The record before us thus clearly supports the trial court's finding that the Division offered various services to John, including substance abuse evaluations, visitation, and psychological evaluations—"none of which [John] took advantage of or sought to complete." Additionally, the court found "the Division had kept [John] apprised of not only the orders that were entered by the court but also appointments that were made for him in terms of evaluation for substance abuse as well as a psychological evaluations." The court also found the Division provided John ample opportunity to visit Cara, and he failed to take advantage of the opportunity.

Judge Mecca further noted, "the reasonableness of the Division's efforts is not measured by their success. In this case there was going to be no success because [John] has made no efforts to even partake in those services." We agree

completely with Judge Mecca's conclusion. We cannot imagine what further steps the Division might reasonably have taken to offer services and to induce John to take advantage of them. The failure to reunite defendant and Cara is in no way attributable to the Division. John alone is responsible for this failure.

## VII.

Finally, John contends the Division failed to prove by clear and convincing evidence that terminating his rights would not do more harm than good. He claims, for example, that the Division provided no evidence regarding Cara's bond with John, noting that Dr. Dyer never completed an evaluation of any such bond. That argument ignores the fact that John failed to submit to an evaluation. He alone is responsible for the absence of a bonding evaluation. But even without a formal psychological evaluation, it is hard to imagine how a three-year-old might bond with a father who chooses not to visit her.

The fourth prong of the best interests test requires that the Division demonstrate that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court may rely on expert testimony when conducting its analysis and may balance the potential injury that a child could experience through the termination of parental rights against the harm that the child might suffer if removed from the resource placement. K.H.O., 161

17

N.J. at 355, 363. Termination of parental rights is necessary when it permits a child to have a secure and permanent home. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592–95 (App. Div. 1996). Relatedly, a child should not "languish indefinitely" in an out-of-home placement while a parent tries to correct his or her parenting difficulties. N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007) (citing N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004)).

Judge Mecca found the "evidence in this case was quite clear" because both a caseworker and Dr. Dyer testified that the child was thriving in Wanda's care. Additionally, the court observed that Wanda was "the focal love and support interest to the child" and that Cara referred to her as her mother. The court accepted Dr. Dyer's expert opinion that if Cara and Wanda's bond was disrupted, Cara would suffer serious emotional and psychological trauma.

Finally, Judge Mecca discussed Cara's best interests:

> It is contrary to the child's best interest to prolong permanent placement as described by Dr. Dyer, because the natural parent is unable to care for the child for a protracted period. Once again, [Willa] has already entered into a[n] identified surrender, and [John] has shown no true interest, even though he may have stated at sometimes about his request to be reunited with [Cara], but has taken no part in any services nor visited with the child for an extended period of time and has basically abandoned [Cara].

We agree completely with Judge Mecca's conclusion that the serious harm Cara would face if she was separated from Wanda outweighs any harm from terminating John's parental rights. There is no reason for Cara to languish indefinitely while John continues to evade the Division and the services it offers. Wanda is ready and able to adopt Cara and provide her with permanency that would benefit her. Given the need for permanency and Cara's strong bond with Wanda, we do not hesitate to conclude that the Division proved the fourth prong by clear and convincing evidence.

To the extent we have not already addressed them, any additional arguments John has made lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4668-18T4