# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4777-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

G.F. and J.J.,

     Defendants,

and

R.W.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF H.W.,

     a Minor.

_____

Submitted May 11, 2020 – Decided August 3, 2020

Before Judges Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0041-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Catherine W. Wilkes, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons and Jane C. Schuster, Assistant Attorneys General, of counsel; Victoria Almeida Galinski, Deputy Attorney General, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Ben Valentin, Assistant Deputy Public Defender, on the briefs).

PER CURIAM

Defendant R.W. (Richard) appeals from the Family Part's June 14, 2019 guardianship judgment, after a trial, terminating his parental rights to H.W. (Heather), born January 2006. Richard challenges the court's findings on all four prongs of the best interests standard. N.J.S.A. 30:4C-15.1(a). The Law Guardian joins the Division in opposing the appeal. Heather supported termination in her trial testimony.

Richard is neither Heather's biological nor adoptive father. But, the trial court determined after a plenary hearing that he was Heather's psychological parent, notwithstanding her estrangement from him, and he thus had standing to

2

contest the complaint of the Division of Child Protection and Permanency (Division) to terminate his rights.[1] Heather's mother, G.F. (Gloria), conditionally surrendered her parental rights. After Richard's trial, the court terminated the rights of Heather's biological father, who had never been involved in Heather's life.

Having reviewed the record in light of Richard's arguments, we conclude that the trial court correctly applied the governing legal principles, and sufficient credible evidence supports its finding that the Division satisfied the best interests standard. We so conclude notwithstanding that eight months after the trial court entered judgment, Heather was removed from the resource home that the trial court found was pre-adoptive.[2] We decline Richard's informal request that we remand in light of the new development, which the Division and the Law

---

[1] The trial court relied on V.C. v. M.J.B., 163 N.J. 200 (2000). Gloria and the Law Guardian unsuccessfully argued that Richard was not a psychological parent and should be dismissed from the litigation. The Division took no position on the question. As the Law Guardian did not cross-appeal from the trial court's order, we assume, without deciding, its correctness.

[2] The Division advised the court of this development pursuant to Rule 2:6-11(f), after Richard filed his initial brief, and the Law Guardian filed his responding brief. As Gloria engaged in an "identified surrender," conditioning her surrender on the Smiths' adoption, Heather's removal from the Smith family reinstated her parental rights. See N.J. Div. of Child Prot. & Permanency v. P.O., 456 N.J. Super. 399, 408 (App. Div. 2018). In June 2020, Gloria generally surrendered her rights.

Guardian oppose.[3]   Although the trial court weighed the then-positive relationship between Heather and her resource parents, the court grounded its decision in its finding that Richard continued to threaten significant harm to Heather's emotional and mental health. That threat arose out of the trauma Heather suffered because of Richard's drug abuse and related behaviors, her repeated removals from his home, her multiple placements thereafter, and her recent discovery that he was not her biological father.  Therefore, we affirm.

## I.

The Division presented its case through the testimony of therapists involved in providing services to Heather; Division workers familiar with the services provided the family; one of Heather's resource parents at the time; and a psychological expert, Barry Katz, Ph.D.  The court also heard from Heather, who testified in camera; and the Law Guardian's psychological expert, Frank

---

[3]  Richard argued for a remand in his reply brief, but filed no formal motion seeking that relief.  We ordered the Division and the Law Guardian to file surreply briefs to address whether a remand was warranted.  They both contended it was not.  We assume Heather continues to support termination of parental rights, as the Law Guardian has not advised us to the contrary.  See N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 113 (2008) (stating that "'[l]aw guardians are obliged to make the wishes of their clients known'" (quoting N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002))).

Dyer, Ph.D.  In his defense, Richard testified and presented two therapists who provided family therapy.  We discern the following from that evidence.

Beginning at the age of four, Heather experienced multiple removals from one or both her parents arising out of their substance abuse; she also experienced multiple placements within the child welfare system.  Heather occasionally accompanied Richard on his trips to purchase drugs; other times, she was left home alone.  She often saw him use drugs and she observed his changed behavior.  After she returned to his care after a nearly year-long removal in 2015, Richard broke his promise to Heather that he would remain sober, leading to her removal again in 2017.  Richard admitted at trial that he did not achieve lasting sobriety until after that last removal.  The Division's and the Law Guardian's experts testified that Heather suffered from complex trauma that was exacerbated by contact with Richard.

Richard was romantically involved with Gloria when she was already pregnant with Heather.  They lived in Indiana.  When Heather was born, he agreed to have his name placed on her birth certificate.  Less than a year later, Gloria and Richard had a son, Isaac.

The family moved to Massachusetts.  After Gloria was "psychiatrically hospitalized" in 2008, Richard was granted sole legal and physical custody of

5

the children. But, two years later, both children were removed from Richard's care after it was discovered Isaac had a burn mark on his body. Richard could not explain the burn, but Heather said Richard had burned Isaac with a lighter. Both children then moved into Gloria's care in Indiana.

In April 2012, due to allegations of substance abuse and domestic violence, Heather and Isaac were removed from the Indiana home of Gloria and her paramour, and placed into foster care. Heather had tested positive for methamphetamine, indicating she had secondhand exposure to the drug. A few months later, Indiana conditionally placed Heather and Isaac in Richard's care in Massachusetts, so long as he agreed to attend Alcoholics Anonymous meetings, "submit to drug testing, and utilize in-home therapy services for the children." Later, Richard moved the family to Sussex County.

Richard admitted in his trial testimony that he was never really sober. The Division was involved with the family in 2014, responding to multiple referrals of drug use and child neglect that were deemed unfounded or not established.[4] In late 2014, police arrested Richard after discovering crack cocaine and drug paraphernalia in his car after a motor vehicle stop. The children remained in his

---

[4] See N.J. Dep't of Children & Families v. R.R., 454 N.J. Super. 37, 40-41 (App. Div. 2018) (describing "not established" and "unfounded" findings).

care. Heather recalled that Richard would go to Paterson to buy drugs and sometimes she accompanied him; other times, she and Isaac would be left home alone. One time, when she could not reach him by phone, she went downstairs to the neighbor, who took care of them until he returned. She also recalled watching him use drugs, and then observe his behavior change. She recalled at trial, without specifying the time, that she asked a neighbor to get Richard help for his drug problem. "I wanted him to get better. . . . [Richard] told me that if he ever goes to jail or gets caught ever because of me, he would never want to see me ever again."

Richard was arrested again for cocaine possession during a late night traffic stop in March 2015. Isaac was with him, but Heather, then nine-years old, discovered no one was home when she woke up alone. She and Isaac were emergently removed and placed in resource care, and did not return to Richard until February the following year. During that time, they cycled through multiple resource homes. Both children received individual therapy. They expressed the desire to return to Richard.

Richard was released from custody in July 2015, but arrested again for crack cocaine possession and placed on probation. Eventually, Richard completed a substance abuse evaluation, outpatient treatment, and individual

therapy. He exercised twice-weekly supervised visitation. He also had a job and housing when he regained custody. Heather testified that upon their reunification, Richard promised her that "he would never do any . . . drugs again, and he would never go to Paterson again." The Division closed its case in Spring 2016.

However, as he admitted at trial, he was not really sober. He also did not continue Heather in therapy, as he had agreed to do. In particular, he had committed to disclose to Heather in a therapeutic setting that he was not her biological father, but he failed to do so. The Division opened the case again in April 2017, upon receiving a referral from the Vernon Police Department. The police had responded to a welfare call upon allegations Richard was under the influence when he returned to retrieve Isaac from a friend's house. The children remained in Richard's care, but he was to submit to urine screens.

Then, in May 2017, Richard was arrested again. This time, he had overdosed on heroin while out driving and needed to be revived with Narcan. A good samaritan saw Richard's car veer off the road and called the police for help. The children were home alone. After Richard's arrest, Heather and Isaac were removed again, and placed together in a resource home. Heather testified she

felt that Richard had lied to her about his drug use. But, she worried that she "wasn't going to get a second chance to go back to him."

The Division explored placing the children back with Gloria, Richard's mother, or the maternal grandmother of another of Richard's children, but all three were ruled out. After multiple placements, Heather was placed with the Smith family in June 2017, and remained there through the trial except for brief respite periods. The Smiths committed to adopt Heather (although as noted, the relationship deteriorated and Heather was removed from the Smiths' home in February 2020).

Richard completed inpatient drug treatment in late June 2017, and resumed visitation in the summer. Both children expressed the desire to reunite with Richard.

But, two developments affected Heather's relationship with Richard. One pertained to where Heather went to school. The Smiths lived an hour away from where she had been going to school. Heather wanted to transfer to the school near the Smiths, so she could participate in after-school activities. Richard opposed this. Although Heather prevailed, the issue created a big rift between Heather and Richard.

The second development was that Gloria — without any therapeutic preparation or planning — informed Heather, in a September 2017 phone call, that Richard was not her biological father. Gloria also informed Heather that a boyfriend had shot her in the face, causing her permanent injury. Heather also learned that she was bi-racial (Richard and Gloria are white.)[5]

When Heather learned Richard was not her biological father, she refused to attend therapeutic visitation until February 2018. Heather began receiving individual therapeutic services in September 2017. While Isaac returned to Richard's care at the end of March 2018, the relationship between Heather and Richard remained fraught.

As Heather explained at trial, Richard provoked a complex set of emotions:

> [W]hen I look at him, it's hard to explain what goes on in my head, but drugs, foster care, he's abandoned me two times, . . . it's just really hard to stand next to somebody that said they cared for me but they don't and . . . they have a weird way of showing it. . . . I just don't like looking at him.

---

[5] It is unclear whether Heather learned this during her telephone conversation with her mother, or later. Heather subsequently obtained a DNA test to explore her identity.

A-4777-18T3

She said she "felt relieved" when she found out he was not her biological father. She lacked confidence in his sobriety. "[E]very time he breaks up with a woman, he goes to drugs." She recalled that he would promise to stop using, attain temporary sobriety, and then relapse.

She testified that she wanted to terminate her relationship with him. "I want to move on from the past and the horror movie that happened." She explained the "horror movie" was her life. "My life has been about drugs, foster care. There ha[ve] been some happy moments, but . . . when bad things happen, it's really hard to just think about the good things."

She looked forward to a "happy future" with the Smiths. She said she "would feel happy" if Richard's rights were terminated, because she'd feel "out of the woods. Meaning that I don't have to live through drugs again and go through foster care."

Although Richard maintained that the Smiths alienated Heather from him, Heather testified that they encouraged her to visit him and to attend therapy, and the decision to resist visitation was hers.

At trial, Richard insisted that his sobriety was permanent and a reunification would be different from the previous times.

> [W]hat makes this different is if we're gonna talk about
> recovery, and we're gonna talk about whether I'm gonna

> relapse and destroy the little girl's world again, you know, I personally got the time that I needed, got the help that I needed. . . . And in the past, you know, nothing about me changed. I can't even honestly sit here today and say I ever quit using before this past two years.

He admitted that "[Heather's] never had stability, even to this day, you know, I can't look back and say that I've ever given her a completely stable household." But he insisted he was prepared to do that. He owned a successful construction business; he was involved with another woman; and intended to move to a new house in Irvington, New York, where they would live with Isaac and the woman's own eight-year-old son. He insisted that uprooting Heather and moving her away from friends and school would offer Heather a "fresh start . . . a solid and stable environment, a home, a new community, new friends, a mother figure, a brother, sister."[6] He agreed the transition would not be easy. He said he would get her services. But when the court asked him if it should just order Heather to return home to him, he said, "I think we should let [Heather] come visit and see how she feels." He said she should meet his fiancé, see their new house, and take a tour of the local school and the community "and then see how she feels."

---

[6] Richard has a six-year-old daughter with another woman, who has primary residential custody.

As noted, experts for the Division and the Law Guardian testified that Heather experienced complex emotional trauma. Dr. Barry Katz, testifying for the Division, opined that the trauma was caused by, among other things, parental drug abuse, neglect, removals, failed reunifications, broken promises of sobriety, and discovering that the person she had perceived as her biological father was not that after all. Dr. Katz stated that Richard was "the representation of the threat, of the trauma. She's had four removals from his care. She's experienced his substance use disorder." Merely seeing Richard triggers in Heather adverse reactions: the "freeze" or "traumatic aspect" in which "she shuts down, she doesn't respond"; the "flee aspect . . . her not wanting to engage with him"; and the "fight . . . aspect, her kind of aggressive, verbally aggressive responses to him."

Dr. Katz explained that Heather's "extreme level of trauma . . . affected her attachment and her ability to bond and relate to [Richard]," despite his recent success in achieving sobriety. In other words, although he had "corrected the substance use . . . he's been unable to correct the harm that was caused from the abuse . . . that had occurred." "[T]he damage has not been undone even though [Richard] is no longer using . . . the harm is still there. She still can't reunify with him at this time. He still can't parent her in the foreseeable future." He

opined that she might, with therapy, be receptive to a non-parental relationship with him if he were not presented as a "threat to her current attachment" to her resource parents.

Although he noted the she had bonded with the current caretakers in opining that "termination of parental rights would do more good than harm for this child," he also opined that termination would cause no harm.

> [T]here's no harm that would be done to [Heather] if the parental relationship with [Richard] is severed at this time because basically it's been severed. It hasn't been there for two years. In fact, even when it was there, it still wasn't there. It was more trauma than it was anything else for her. And that's what her takeaway is from it, and that's what the effect on her brain and her emotions are from that, and her body as well. So, when stressed and pushed into that and when that's a threat, we see signs of new breakdowns occurring consistent with complex trauma. There are the . . . recent reports of eating disorder problems, [and] . . . headaches following the visits.

Testifying for the Law Guardian, Dr. Frank Dyer performed a bonding assessment of Richard and Heather, and psychological evaluation of Richard. He testified that Richard "verbalize[d] that [Heather] suffered because of his actions," and acknowledged that his drug use led to "the determination that the children were not safe in his home in both of those instances." But, he mistakenly believed that once he achieved lasting sobriety, Heather could return

14

home. Richard also attributed Heather's resistance to reunification to what he believed was the Division's inadequate response to her discovery of his non-parentage, and Heather's prolonged stay in resource care.

However, Dr. Dyer held Richard primarily responsibility for Heather's aversion to him, not any failure in services. Although Dr. Dyer conceded that more intensive services should have been provided Heather, he noted Richard's failure to access services for Heather, as he agreed, when she was in his custody.

Dr. Dyer concluded that even if Richard had moved beyond the "immediate danger of relapse," "we are all well past any possibility of a successful reunification with [Heather] because of this trauma dynamic." He explained:

> As I view the problem, this child has been so profoundly affected by her history of repeated traumatic experiences, losses, disruptions in the continuity of her care, and especially reunifications with [Richard] in which he promised to take care of her, to provide for her needs, and promised to do the right thing, in other words, to serve as an adequate role model for her, and then to fail utterly at that, to expose her to renewed drug related behaviors, dates in which he was impaired, and ultimately further removals, that all of these experiences add up to a severely traumatized, frightened and ashamed child with poor self-esteem, a very confused and perhaps chaotic self-concept who is struggling to maintain some kind of organized life at this point, and to maintain her psychological equilibrium.

15

The unsuccessful reunifications with Richard "increased her distrust." Not only did Dr. Dyer opine that a reunification would likely fail — drawing on his familiarity with hundreds of cases, he had never seen a successful reunification follow a failed one — Dr. Dyer stated that attempting it would "have an extraordinarily negative effect on [Heather]." Heather's "brain organization" led her to experience a "stress response; fight, flight or freeze; that is triggered very easily by the slightest stimuli that remind her of everything that she went through while she was under the care of [Richard]. And that is not going to change." Heather told Dr. Dyer that when she sees Richard, "she is reminded of all the drugs stuff, and all the drug stuff comes back . . . contact with [Richard] is a trauma trigger for her because of her experiences of living in a drug environment." Heather also reported not being able to eat after seeing Richard. She told Dr. Dyer that she did not want to return to Richard's custody.

Dr. Dyer opined that terminating the parental relationship would cause no harm; instead, it would provide Heather with "relief." Although he may have been Heather's psychological parent in the past, "she is no longer attached to him as a result of these negative experiences . . . ."

On the other hand, continuing the parental relationship was a source of continuing trauma. "[S]he would suffer severe and enduring harm if the parental

relationship were carried forward." Disrupting Heather's placement with the Smiths — who Dr. Dyer viewed as future adoptive parents — "would inflict more damage on her, would re-traumatize her, would make her more insecure, more angry, more anxious than she already is." Richard would be unable to "mitigate any harm done by the loss of the resource parents."

## II.

Judge Michael C. Gaus rendered a comprehensive written opinion in support of his order terminating Richard's parental rights. Judge Gaus found Dr. Katz and Dr. Dyer to be credible expert witnesses. He credited Heather's testimony, finding her recall "compelling," and "[h]er explanation supporting her desire [to remove Richard from her life]" to be "detailed and believable." He also credited the Division's other witnesses. In contrast, the trial judge found Richard was not credible; and his testimony indicated a "lack of understanding as to the depth and seriousness of [Heather's] trauma."

The court found that the Division met all four prongs of the best interests standard. N.J.S.A. 30:4C-15.1(a)(1)-(4). The court noted that Richard did not contest prong one — "whether the child's health and development has been or will continue to be endangered by the parental relationship." Moreover, there was "overwhelming evidence" the prong was satisfied. Richard had been

17

previously arrested buying drugs and overdosing late at night while leaving Heather home alone; Heather had been removed from Richard's care multiple times; and Richard often took Heather with him to purchase drugs in New Jersey.

> Although the risk of harm to [Heather] stemming from [Richard's] drug use itself was substantial, the most detrimental harm to [Heather] was the emotional harm she suffered as the result of multiple Division removals, attempted reunifications, and [Richard's] lies and broken promises. . . . [H]is parental relationship with [Heather] is highly likely to cause recurrent harm.

The court noted "the expert testimony regarding the harm that has befallen [Heather] has been clear, unambiguous and uncontroverted."

Judge Gaus held that prong two "focuses on determining whether the parent has rectified the harm that initially endangered the child's health, safety, and welfare, and whether the parent is able to continue a relationship with the child without placing the child at risk of further harm." (Citing K.H.O., 161 N.J. at 352). The court addressed the harm Heather would suffer if her bond with the Smiths were disrupted.

But, the court also found that Richard "is unable or unwilling to eliminate the harm that has endangered the child and the parental relationship." The court cited Richard's lack of understanding and failure to act.

> A willingness to try does not always equate to a willingness to understand and act. His delay and

resistance to some of the Division's requests and services, and his assurance that [Heather] will be okay when she moves with the family to New York because she will, essentially, just have to tough it out, bespeaks his unwillingness to truly accept the monumental trauma he has caused her to suffer and with which she continues to struggle.

However, prong two was also met because Richard's presence itself continued to cause Heather harm:

He is unable to provide [Heather] with a safe and stable home, primarily due to his own presence in the home. Drs. Dyer and Katz both testified extensively about the harm [Heather] suffers even visiting [Richard]. Even merely seeing him brings [Heather] back to the trauma she has suffered. Her trauma is so extensive that therapeutic interventions have not assisted in helping her reach a resolution at this time. Further, the uncontroverted expert opinions of both Dr. Katz and Dr. Dyer support the Division's position that continued therapeutic interventions are currently rendered futile, as [Heather] is so traumatized from the parental relationship with [Richard] that continued interventions at this time are detrimental to her health, safety, and welfare.

Regarding prong three, the court concluded that the Division "made reasonable efforts to provide services to help [Richard] correct the circumstances which led to [Heather's] placement outside the home" and the court considered alternatives to terminating parental rights. The court recognized that reasonable efforts are "not measured by their success." (Quoting

In re Guardianship of DMH, 161 N.J. 365, 393 (1999)).  The court found the

Division's reasonable efforts included:

> substance abuse evaluations, psychological evaluations, bonding evaluations (both for [Heather] and [Richard] as well as [Heather] and the resource parents) visitation, referrals to therapeutic supervised visitation, individual therapy for [Heather], [Richard], and [Isaac], family therapy, trauma focused cognitive behavioral therapy for [Heather]; offers of transportation, urine screens and hair/fingernail testing, keeping [Richard] abreast of [Heather's] progress, challenges, and needs, exploration of several relatives for placement, family team meetings, and placement reviews.

Citing the experts' testimony, the court concluded that "[t]he emotional damage

to [Heather] over the years was too great to overcome," despite two years of

services.  Implicitly rejecting Richard's argument that the Division failed to

provide appropriate services, Judge Gaus found, "The trauma that [Heather]

suffered, for which defendant is responsible, forms the crux of what has caused

the Division's reasonable efforts to fail."

As for prong four, the court found that termination of parental rights

would not do more harm than good.  Judge Gaus relied on Heather's own

testimony that she wanted to be adopted by the Smiths and "her trust in [Richard]

is irreparably broken given the prior betrayals . . . ."  The court credited one or

both experts' "extremely strong and uncontroverted" opinions that Richard

reminded Heather of her traumatic experiences; Heather did not view Richard

20

as "an attachment figure"; reunification would destabilize her; and freeing her for adoption would not cause "any appreciable level of psychological harm to [Heather]." On the other hand, termination of her relationship with the Smiths would cause "severe and enduring harm," which Richard would be unable to mitigate. The judge concluded that "not terminating [Richard's] parental rights will cause more harm than good" and "terminating parental rights would do more good than harm." Having found all four prongs of the best interests test satisfied, the trial court terminated Richard's parental rights.

### III.

We exercise limited review of the trial court's decision. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We defer to the trial court's fact-finding because of its "special expertise" in family matters and its "superior ability to gauge the credibility of the witnesses who testify before it[.]" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). "We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). Put another way, "the trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" J.N.H., 172 N.J. at

472 (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

In reviewing the legal issues de novo, see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we must determine whether the trial court properly applied the best interests standard, which requires the Division to prove the following four factors by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

Applying this standard of review, we would affirm substantially for the reasons set forth in Judge Gaus's thorough opinion, were it not for Heather's removal from the Smiths' home. The change in circumstances compels us to provide additional comments regarding prongs two and four. Before doing so, we briefly address Richard's challenge to the court's prong one and prong three findings.

Regarding prong one, we reject Richard's challenge because the evidence was overwhelming that both the retrospective and prospective aspects of the test were met: Richard endangered Heather's "safety, health or development," N.J.S.A. 30:4C-15.1(a)(1), and the harm is such that it "threatens [Heather's] health and will likely have continuing deleterious effects" on her in the future. K.H.O., 161 N.J. at 352; see also N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013) (finding that "harm and risk of harm were proven because the parents' drug use resulted in their failure to provide a stable home, with appropriate nurture and care of the young child, and because they had a history of criminal arrests and incarcerations that created a serious risk of emotional long-term harm of the child"). In trial testimony and in his evaluations with the experts, Richard candidly acknowledged the harm he caused Heather. Furthermore, his trial counsel conceded before the trial court

that the Division met prong one.[7] Richard may not revisit the issue before us. Reynolds v. Lancaster Cty. Prison, 325 N.J. Super. 298, 315 n.2 (App. Div. 1999) (stating that party who conceded that "plaintiffs had presented adequate proofs" at trial "cannot disavow that concession and argue to the contrary on appeal").

Regarding prong three, we reject Richard's contentions that the Division offered inappropriate and inadequate services; the Division should have, effectively, forced Heather to attend sessions with him; and the Division should have removed Heather from the resource family, which he claimed alienated Heather from him. The Division presented substantial evidence that Richard and Heather received a broad array of appropriate services; Heather ultimately

---

[7] Trial counsel stated:

> The reason why I did not argue prong one is because to [Richard]'s credit, he acknowledges that the history caused by his substance abuse has caused trauma to his daughter. He's never denied that. . . . [A]s to whether the child's health, safety, development, he acknowledges that there's trauma. We're not . . . to fight that she has trauma would be silly and . . . would undercut his credibility in the [c]ourt's eyes, I would . . . presume. So . . . that's not contested.

Although trial counsel disputed that Heather would "continue to be . . . endangered by the parental . . . relationship," the prong one test is met by proving either a child's health or development "has been . . . endangered" "or will continue to be endangered." N.J.S.A. 30:4C-15.1(a)(1).

decided that she could not face Richard and the experts testified that forcing her to do so would exacerbate her trauma; and Heather testified that her resource parents encouraged her to see Richard. We defer to Judge Gaus's factual findings underpinning his prong three finding. As the judge recognized, success is not the test as to whether the Division has made reasonable efforts under prong three. The Division's "best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

We now turn to the second and fourth prongs of the best interest test. We recognize that in reaching its findings as to both, the court relied on the evidence that Heather had formed a strong bond with her resource parents, and that terminating that bond would cause her severe harm. However, we are convinced that, without more, proof that Heather was removed from her resource home is insufficient to disturb the trial court's judgment.

The second prong can be established "if the destruction of the bond that the child has developed with a third party during placement will cause the child enduring emotional or psychological harm." Fall & Romanowski, Child Custody, Protection & Support, § 13:5-3 (2019); see also F.M., 211 N.J. at 451 (stating that "[p]rong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption

of [the] bond with foster parents.'" (quoting K.H.O., 161 N.J. at 363) (alterations in original)). However, the ultimate inquiry under prong two is "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care. No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health." N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986); see also In re Guardianship of J.C., 129 N.J. 1, 10 (1992) (stating "the cornerstone of the [best interests of the child] inquiry is not whether the biological parents are fit but whether they can cease causing their child harm").

Although the prong two finding may no longer rest on avoiding the harm from separating Heather from the Smiths, the evidence supported the trial court's finding that Richard was incapable of avoiding harm to Heather. As a result of the history of trauma, Richard's mere presence triggered in Heather a fight or flight response; emotional turmoil; and physical symptoms. The court credited both experts' opinion that even attempting reunification would cause Heather harm. As the judge found, "Even merely seeing [Richard] brings [Heather] back to the trauma she has suffered. Her trauma is so extensive that therapeutic interventions have not assisted in helping her reach a resolution at this time . . . [and] continued therapeutic interventions are currently rendered futile." Thus,

26

the judge appropriately "consider[ed] the potential psychological damage that may result from reunification as the 'potential return of a child to a parent may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting A.W., 103 N.J. at 605).

The post-judgment change in Heather's placement also removes an element of the trial court's prong four finding that termination of parental rights would not cause more harm than good. N.J.S.A. 30:4C-15.1(a)(4). The judge recognized that this prong of the best interests test required comparing the child's bonds with Richard and with her resource parents; and determining whether terminating Richard's relationship would cause more harm than disrupting the relationship with the resource parents. See K.H.O., 161 N.J. at 355. Nonetheless, "[i]nherent in the fourth factor is that a child has a 'paramount need for a permanent and defined parent-child relationship.'" New Jersey Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004) (quoting J.C., 129 N.J. at 26). "The question ultimately is . . . whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108.

Terminating the parental relationship will free Heather to form a relationship with other resource parents. We are mindful of the "unfortunate truth that not all children, who are 'freed' from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship." A.W., 103 N.J. at 611. "A court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). On the other hand, "there will be circumstances when the termination of parental rights must precede the permanency plan"; in particular, "a young adolescent might not be adoptable at the time of the termination proceedings." A.W., 103 N.J. at 611.

This case is unlike E.P., where the Court compared "the slim hope of adoption" for a child with severe behavioral problems against terminating the "one sustaining force in [the child's] young life — her mother's love and emotional support." 196 N.J. at 109. There is no evidence before us, specifically related to Heather, that the prospects for her permanent placement with another

family are grim.[8]  Furthermore, the evidence was substantial that the relationship with Richard — rather than providing emotional support — is a source of intense trauma.  As Dr. Katz noted, there would be no harm to Heather if the parental relationship were severed, as it had already been severed and had not existed for two years.

Our courts have recognized that, despite a child's strong interest in stability and permanence, a trial court may vacate a judgment terminating parental rights upon a showing of an exceptional situation, or a significant change in circumstances rendering the judgment inequitable.  J.N.H., 172 N.J. at 472-73 (citing R. 4:50-1(f) and (e)).  And, an appellate court may remand to permit the trial court to consider current facts that may undermine its previous findings.  N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010).

---

[8] We decline to take judicial notice of statistics Richard cites purporting to show that only 6.4 percent of bi-racial children were adopted in New Jersey. See N.J.R.E. 202(b).  He evidently misreads the report.  See Report to Congress, Administration for Children & Families, Child Welfare Outcomes 2016, https://www.acf.hhs.gov/sites/default/files/cb/cwo2016.pdf.  Rather, bi-racial children comprise 6.4 percent of all adopted children in 2017 (and 7.8 percent of all children waiting for adoption).  See Children's Bureau, Child Welfare Outcomes Report Data, https://cwoutcomes.acf.hhs.gov/cwodatasite/adopted/index.  That statistic does not reflect what percentage of bi-racial children are ultimately adopted.  More importantly, broad statistics say nothing about Heather's individual prospects for adoption.

In T.S., the mother and daughter had formed a strong bond and the mother had, by successfully completing drug rehabilitation, removed the danger that prompted removal. Id. at 238-39.[9] Following trial, the mother maintained her sobriety, and maintained positive telephone and internet contact with her daughter. Meanwhile, the prospective adoptive parents changed their minds, and the child was assaulted in the resource home where she was next placed. The Law Guardian shifted from supporting termination before the trial court, to opposing it on appeal, id. at 247, as the twelve-year old daughter who "seemed so sure she could live without her mother . . . now strongly expressed a wish to resume their relationship," id. at 249. Presented with those circumstances, we reversed the trial court's judgment and remanded for an assessment of the parent's current ability and a reassessment of the second and fourth prongs.

In J.N.H., the Supreme Court reversed a trial court's order denying a motion to vacate a judgment terminating parental rights. The mother presented evidence to the trial court of her successful rehabilitation and her successful resumption of custody of her two other children, thereby belying predictions at trial that her sobriety would not last. More importantly, to the Court, she

_____

[9] Notably, in that case, Dr. Katz testified on the mother's behalf against termination.

A-4777-18T3

presented evidence of the child's worsening emotional problems in foster care, three years after an expert opined he was thriving there. 172 N.J. at 475-77.

Both T.S. and J.N.H. are distinguishable. Although, as in those cases, Heather has not secured the positive, permanent placement anticipated, the parents in those cases made significant progress in addressing the conditions that posed a threat of harm to the child. That is not true in this case. As the experts testified, Richard's sobriety was not sufficient to alleviate the harm to Heather. Reunification had failed and would continue to fail, they opined, because of the significant trauma Heather experienced, and her association of Richard with that trauma. There also is no evidence that Heather herself has changed her views regarding reunification.[10]

In closing, we do not question that Richard loves Heather and honestly believes that with time and services, he could be a source of emotional support and stability, rather than a trigger for emotional harm. However, the record supports Judge Gaus's determination that Richard has caused Heather serious

---

[10] We express no opinion as to the merits of a motion before the trial court under Rule 4:50-1 to vacate the judgment based on a significant change in circumstances or other exceptional situation. We hold only that the fact that Heather was removed from the Smith home — without more — is insufficient in this case to warrant our reversing the trial court's judgment and remanding for further fact-finding.

A-4777-18T3

harm; he is unable to prevent future harm from his relationship; the Division provided reasonable services; and termination would not cause more harm than good. Those findings subsist, notwithstanding Heather's post-judgment removal from the Smiths' home.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4777-18T3